2001 UT 112

**ASSOCIATED GENERAL CONTRAC-
TORS, Utah Chapter, Plaintiff
and Appellant,**

v.

**BOARD OF OIL, GAS AND MINING, De-
partment of Natural Resources, State of
Utah, Defendant and Appellee.**

No. 20000389.

Supreme Court of Utah.

Dec. 21, 2001.

Joseph C. Rust, Salt Lake City, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Thomas A. Mitchell, Asst. Att'y Gen., Salt Lake City, for defendant.

RUSSON, Associate Chief Justice.

¶ 1 Appellant Associated General Contractors ("AGC") filed suit challenging the Board of Oil, Gas and Mining's ("the Board") promulgation of a rule defining the terms "sand," "gravel," and "rock aggregate" as used in sections 40–8–4(3)(b) and 40–8–4(8)(b) of the Utah Code. The district court upheld the rule, granting summary judgment in favor of the Board. We affirm.

## BACKGROUND

¶ 2 The Utah Mined Land Reclamation Act ("the Mining Act") requires affected mining operations within the state to ensure that their lands are restored "during or after mining" to a "safe, stable, ecological condition and use which will be consistent with local environmental conditions." Utah Code Ann. §§ 40–8–4(14), –12.5 (1998). To implement this objective of "reclamation," the Mining Act charges the Board with "enact[ing] rules ... necessary to carry out the purposes" of the statute. *Id.* § 40–8–6(1). The statute further authorizes the Board to "take such other actions within the purposes

of this act as may be necessary to enforce its provisions." *Id.* § 40–8–6(4).

¶ 3 In 1987, the legislature amended the Mining Act to restrict its regulatory scope. Specifically, the new amendment excluded from regulation the extraction of sand, gravel, and rock aggregate. The statute now reads, " 'Deposit' or 'mineral deposit' excludes sand, gravel, [and] rock aggregate." *Id.* § 40–8–4(3)(b). Likewise, the statute states that the term " '[m]ining operation' does not include ... the extraction of sand, gravel, and rock aggregate...." *Id.* § 40–8–4(8)(b). The amendment, however, did not define sand, gravel, or rock aggregate.

¶ 4 Subsequently, on February 7, 1997, the Board proposed a draft rule defining the terms sand, gravel, and rock aggregate as used in the Act. Noting that such definitions were necessary to "clarify [the Act's] exemptions to the regulated community," the draft rule interpreted sand to mean sedimentary, "naturally occurring unconsolidated or moderately consolidated[1] accumulation of rock and mineral particles, the dominant size range being between 1/16mm to 2mm." Likewise, the draft rule proposed defining gravel to include sedimentary, "naturally occurring unconsolidated or moderately consolidated accumulation of rock and mineral particles" predominantly sized 2 mm to 10 mm. Finally, the draft rule sought to define rock aggregate as "those consolidated rock materials occurring within or above a sand deposit, a gravel deposit or a sand and gravel deposit that were emplaced by sedimentary processes acting contemporaneously with or subsequent to the formation of the sand or sand and gravel deposit."

¶ 5 Following proposal of this draft rule, the Board requested informal public comment on its recommended definitions of sand, gravel, and rock aggregate. Accordingly, the Board notified 173 Utah counties, cities, and other interested parties of the proposed rule

---

1. The term "consolidated" is used geologically in roughly the same sense it would be in other contexts, meaning "to join together into one whole" or to "unite." *Webster's Ninth New Collegiate Dictionary* 280 (1984). According to the United States Environmental Protection Agency, for example, "consolidated rock" is "[a] general term for the solid rock that underlies soils or other surficial material...." U.S. EPA, *Consolidated Rock/Bedrock, at* http://www.epa.gov/seahome/groundwater/src/consolidated.htm. "Unconsolidated materials," in contrast, "include, in order of increasing grain size, clay, silt, sand, and gravel." U.S. EPA, *Unconsolidated Materials, at* http://www.epa.gov/seahome/groundwater/src/unconsol.htm.

in a letter dated July 25, 1997. In addition, the Board accepted public comment and testimony on the proposed definitions at five separate briefing sessions held in May, June, July, and October 1997 and January 1998.

¶ 6 The Board also conducted three public meetings concerning its proposed definitions on November 25, 1997, December 15, 1997, and January 28, 1998. Parties attending these meetings consisted of both concerned citizens and representatives of interested parties and governmental entities, including AGC. During its December 15 meeting, the Board requested that participants submit additional written comments on the proposed definitions. Subsequently, the Board received the requested comments, which included various suggested revisions to. the draft rule's definitions of sand, gravel, and rock aggregate. Utah County, for instance, claimed that the Board's proposed definition of rock aggregate was too much "like a standard geology definition," and thus urged the Board to instead adopt a definition based on economics. Similarly, AGC contended throughout the process that the Board should promulgate a rule defining sand, gravel, and rock aggregate as materials that "inherently ha[ve] no greater value than the material around" them. The Utah Mining Association, however, wrote to the Board during the informal comment period in support of the proposed definitions. Its letter stated, "[W]e have reviewed the [proposed] definition[s] and have no objection.... We appreciate that you presently do not have any measurement to differentiate between [mining and sand, gravel, and rock aggregate operations,] and support the concept embodied in the proposed definition[s]."

¶ 7 At the conclusion of its January 28, 1998, meeting, the Board decided "to proceed forward with [formal] rulemaking regarding the definition of sand, gravel, and rock aggregate." However, the Board further determined that while it would continue to propose the definitions of sand and gravel

contained in the draft rule, it would alter the proposed definition of rock aggregate to reflect a definition that had been previously challenged in *Larson Limestone Co. v. State, Division of Oil, Gas & Mining*, 903 P.2d 429 (Utah 1995).[2] That definition read: " '[R]ock aggregate' ... mean[s] rock materials associated with a sand deposit, gravel deposit, or sand and gravel deposit that were created by alluvial sedimentary processes. [T]he definition of rock aggregate specifically excludes any solid rock (bedrock) exposed at the surface of the earth or overlain by unconsolidated material."

¶ 8 Accordingly, on February 3, 1998, the Board initiated a formal rulemaking for defining sand, gravel, and rock aggregate. First, the Board published notice on February 8, 1998, in the state's two major newspapers seeking public comment on the proposed rule. Then, on February 25, 1998, the Board conducted a formal, on-the-record hearing to receive evidence on the proposed rule. At the hearing, Lowell Braxton, director of the Utah Division of Oil, Gas and Mining ("the Division"),[3] explained why the Division supported definitions "based on geological distinctions instead of the end use" of materials. He stated:

> We have a statutory obligation to regulate non-coal mining activity that does not contemplate an end use or a specific commodity. In other words, we regulate the activity, · not the specific commodities, unless otherwise exempted.
>
> Second[ ], ... [t]he legislative findings [of the Mining Act] state that mined land should be reclaimed to promote post-mining land uses and that reclamation requirements need to reflect the diversity of topographic, geologic, economic, and other criteria specific to a given deposit. Therefore, ... reclamation of disturbances, not commodities-specific or end-use reclamation, is directed by statute.

2. Although the definition of rock aggregate was disputed in *Larson Limestone,* we did not reach the issue. 903 P.2d at 430.

3. The Division of Oil, Gas and Mining is the administrative agency charged generally with

regulating exploration and development of coal, gas, oil, and other minerals in Utah. The Board is its policymaking subdivision. Utah Code Ann. § 40–6–4(1) (1998).

[Finally, t]he [l]egislature exempted from regulation ... sand, gravel, and rock aggregate ..., again, with no mention of end use.

Mr. Braxton further testified that he believed the Board's proposed definitions to comport with the legislative intent of the Mining Act, reasoning that in referencing the terms sand, gravel, and rock aggregate together, "[the legislature was] clearly talking about rock aggregate in conjunction with sand and gravel operations." He also stated that the Division does not "regulate sand, gravel, and rock aggregate[,] and we don't propose to regulate that." Finally, Mr. Braxton noted that the Board had received extensive public comment on the proposed definitions, and that in drafting the definitions, the Board relied on "two widely recognized geologic source materials" produced by the American Geological Institute and the United States Bureau of Mines.

¶9 Following Mr. Braxton's testimony, three representatives of AGC testified in opposition to the Board's proposed definitions. Specifically, AGC contended that the definitions' inclusion of only unconsolidated and moderately consolidated materials was not "consistent with the legislative intent" of the Act. Consequently, AGC requested that the Board adopt definitions based, not on whether such materials were deposited by sedimentary processes, but instead on whether they have a "greater intrinsic value than the material in which [they are] contained."

¶10 Approximately two months later, on April 22, 1998, a quorum of the Board convened to deliberate on the proposed rule. After considering "all supporting and opposing comments, sworn testimony, and exhibits," along with the evidence gathered throughout the informal rulemaking process, the Board found the proposed definitions of sand, gravel, and rock aggregate to be "based on substantial geological evidence and, as such, [to be] entirely consistent with the letter and intent of the ... [Mining] Act." Accordingly, the Board unanimously adopted the proposed rule, defining sand, gravel, and rock aggregate in the following manner:

"Sand" means a naturally occurring unconsolidated to moderately consolidated accumulation of rock and mineral particles, the dominant size range being between 1/16mm to 2mm, which has been deposited by sedimentary processes.

. . . .

"Gravel" means a naturally occurring unconsolidated to moderately consolidated accumulation of rock and mineral particles, the dominant size range being between 2mm and 10mm, which has been deposited by sedimentary processes.

. . . .

"Rock Aggregate" means those consolidated rock materials associated with a sand deposit, a gravel deposit, or a sand and gravel deposit, that were created by alluvial sedimentary processes. The definition of rock aggregate specifically excludes any solid rock in the form of bedrock which is exposed at the surface of the earth or overlain by unconsolidated material.

Utah Admin. Code R647–1–106 (2001).

¶11 Displeased with these definitions—and with the Board's rejection of their economic approach to defining the terms—AGC filed suit on September 4, 1998, challenging the final rule pursuant to section 12.1 of the Utah Administrative Rulemaking Act ("the Rulemaking Act"). Utah Code Ann. § 63–46a–12.1 (1997). On October 29, 1998, AGC served on the Board its first set of interrogatories and requests for production of documents. In response, the Board moved for a protective order, contending that discovery was improper since the Rulemaking Act empowers district courts "to function in an essentially appellate capacity in reviewing ... administrative rule[s]." AGC replied by arguing, among other things, that "[d]iscovery is necessary to determine whether [the Board's] rule is consistent with its governing statute." After considering both motions, the district court issued a protective order in a ruling dated March 8, 1998, excluding discovery from the suit.

¶12 Subsequently, both parties moved for summary judgment. In support of its motion, the Board argued that it possessed the "technical expertise" necessary to define

sand, gravel, and rock aggregate under the Mining Act; that its definitions of these terms were "reasonable and based on substantial evidence"; and that in determining whether its rule appropriately conformed to the Mining Act and was supported by substantial evidence, the district court should employ an arbitrary and capricious standard of review. Conversely, AGC urged the district court to "apply [a] correction of error" standard of review, and thus, "declare the rule invalid" because the definitions "conflict" with the Mining Act's language and intent. In addition, AGC contended that the Board's rule should be overturned because it was not supported by substantial evidence.

¶ 13 On March 21, 2000, the district court granted summary judgment in favor of the Board, finding under an arbitrary and capricious standard that the Board's definitions "correspond[ ] with the overall purpose of the Mining Act." The court held:

> [T]he Board's definition of sand, gravel[,] and rock aggregate [is] within the tolerable limits of reason.... The Board's rule ... appears to further the purpose of the Act. The Board agrees with [AGC] that sand, gravel[,] and rock aggregate are exempt [from regulation]. The rule rationally assists in determining those entities that are exempt from the Act.

Likewise, the court dismissed AGC's argument that the rule was not supported by substantial evidence. Ruling that the Board's definitions should be upheld so long as the " 'quantum and quality of relevant evidence ... is adequate to convince a reasonable mind to support a conclusion,' " the court found that AGC had "fail[ed] to cite any specific facts to support their contention." (Quoting *First Nat'l Bank of Boston v. County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990).) The court noted further, "[T]he administrative record appears to support the rule by substantial evidence. Proper rulemaking procedures were followed ..., and the Board's findings supporting the rule are rationally based."

## ANALYSIS

¶ 14 On appeal, AGC raises four arguments: (1) that the district court erred by applying improper standards of review; (2) that the Board's rule does not conform with "the language or the intent of the [Mining] Act"; (3) that the rule is not supported by substantial evidence; and (4) that the district court erred by disallowing discovery. We address each issue in turn.

## I. STANDARD OF REVIEW

¶ 15 AGC contends as a threshold matter that the district court erred by employing improper standards of review in examining the Board's final rule. Specifically, AGC argues that the district court erred by applying separate standards of review to each of AGC's substantive challenges to the Board's definitions rather than a single correction of error standard to the whole rule.

¶ 16 The issue of what comprises the appropriate standards of review under section 12.1 of the Utah Administrative Rulemaking Act is a question of first impression for this court. Previously, the Rulemaking Act allowed parties whose legal rights or privileges were impinged by an administrative rule to challenge the "validity or applicability of [the] rule" by bringing an action for declaratory judgment "in any district court of th[e] state with appropriate venue." Utah Code Ann. § 63–46a–13 (1986); *see also Williams v. Pub. Serv. Comm'n*, 754 P.2d 41, 46 (Utah 1988). In 1990, however, the legislature amended the Rulemaking Act, allowing "[a]ny person aggrieved by a rule" to challenge its promulgation "in the district court where the person resides or in the district court in Salt Lake County." Utah Code Ann. § 63–46a–12.1(1)(a) (1997). In addressing such challenges under the amended version of the Rulemaking Act, the district court is authorized to declare the rule at issue invalid if the court finds that

(i) the rule violates constitutional or statutory law or the agency does not have legal authority to make the rule;

(ii) the rule is not supported by substantial evidence when viewed in light of the whole administrative record; or

(iii) the agency did not follow proper rulemaking procedure.

*Id.* § 63–46a–12.1(4)(a).

■■■ ¶ 17 When determining the appropriate standards of review for rulemaking challenges authorized by statute, we engage in the same process used for interpreting other statutory provisions. We look first to the plain language of the act. *See Nebeker v. State Tax Comm'n,* 2001 UT 74, ¶ 21, 34 P.3d 180; *Morton Int'l, Inc. v. Auditing Div. of Utah State Tax Comm'n,* 814 P.2d 581, 587 (Utah 1991). If a statute is silent as to what standards of review apply under its provisions, however, we employ the applicable standards of review as previously enunciated by our decisional law. *See Morton,* 814 P.2d at 585–87. In this case, the Rulemaking Act is silent as to what standards of review apply to challenges lodged under the statute, *see* Utah Code Ann. § 63–46a–12.1(1)(a),[4] and we therefore apply the existing standards as explained by our prior case law. *See Morton,* 814 P.2d at 585–87.

## A. *Alleged Violations of Constitutional or Statutory Law*

¶ 18 AGC's first challenge to the rule is that the Board's definitions violate the "statutory language [and] legislative intent" of the Mining Act. *See* Utah Code Ann. § 63–46a–12.1(4)(a)(i). We most recently explained the relevant standards of review for challenges to administrative rulemakings in *Williams v. Public Service Commission,* 754 P.2d 41, 50 (Utah 1988). Addressing the Public Service Commission's promulgation of a rule concerning its lack of jurisdiction over one-way paging systems, we observed in *Williams* that the appropriate standard of review depends on the type of challenge to the rule:

When reviewing [an agency]'s interpretation of general questions of law, this Court applies a correction-of-error standard, granting no deference to [agency] decisions. [However,] [t]his Court will afford great deference to [agency] findings on

matters of basic fact, upholding those findings based on any evidence of substance. [Finally, on] matters of ultimate fact, mixed findings of fact and law, and [the agency's] interpretation of the operative provisions of the statutory law it is empowered to administer, [agency] findings must be rationally based and are set aside only if they are imposed arbitrarily and capriciously or are beyond the tolerable limits of reason.

*Id.* Subsequently, we have further explained that "general questions of law" include constitutional questions, rulings concerning an agency's jurisdiction or authority, interpretations of common law principles, and interpretations of statutes unrelated to the agency. *Morton,* 814 P.2d at 585. Conversely, instances involving "ultimate fact[s], mixed findings of fact and law, and [an agency's] interpretation of the ... statutory law it is empowered to administer" are limited to situations where the agency has been granted explicit or implicit discretion under the statute, where the agency possesses expertise concerning the operative provisions at issue, or where the agency is otherwise in a better position than the courts to assess the law due to its experience with the relevant subject matter. *Williams,* 754 P.2d at 50; *see also Morton,* 814 P.2d at 586.

■■■ ¶ 19 Here, the crux of AGC's contention that the rule violates the "statutory language [and] legislative intent" of the Mining Act relies, not upon a general determination or question of law, but on the Board's interpretation of the operative terms sand, gravel, and rock aggregate. These terms, like many of the operative terms in the Mining Act, are technical and scientific in nature. They concern a subject matter—mining and reclamation—that courts address only occasionally but that the Board and the Division handle regularly. In fact, the legislature has delegated to the Board regulatory authority over "all operations ... related to the production

---

4. In contrast, the Utah Administrative Procedures Act, which is the governing act for administrative adjudications in Utah, provides guidance concerning what constitutes the appropriate standards of review under that statute. *See* Utah Code Ann. § 63–46b–16(4)(d),

(h)(i), (h)(iv) (indicating some standards with terms such as "erroneous[ ]," "abuse of discretion," and "arbitrary or capricious"); *see also Morton,* 814 P.2d at 587–95 (construing the statute's standards of review).

of oil or gas," Utah Code Ann. § 40–6–5(3)(a), along with "the reclamation of lands affected by mining operations." *Id.* § 40–8–7(1)(d). This expertise and authority places the Board in a better position than the judiciary to interpret terms specific to the mining industry—including sand, gravel, and rock aggregate. Accordingly, the appropriate standard of review for determining whether the Board's definitions of sand, gravel, and rock aggregate violate the Mining Act is one of arbitrariness and capriciousness. *See Morton*, 814 P.2d at 586–87; *Williams*, 754 P.2d at 50; *see also Savage Bros. v. Pub. Serv. Comm'n*, 723 P.2d 1085, 1087 (Utah 1986). Therefore, we hold that the district court did not err by employing this standard of review in determining whether, as AGC contends, the rule violates the text and intent of the Mining Act.

### B. Substantial Evidence Challenges

¶ 20 AGC bases its second challenge to the Board's rule on the premise that the rule "is not supported by substantial evidence." Utah Code Ann. § 63–46a–12.1(4)(a)(ii). Like the Rulemaking Act's language permitting aggrieved parties to challenge administrative rules for their violation of constitutional or statutory law, the statute's provision allowing for challenges on the ground that a rule lacks the support of "substantial evidence" is novel language introduced into the Act by the legislature in 1990. However, unlike the statute's new allowance of challenges to rules for violations of constitutional or statutory law, the Rulemaking Act's provision for challenges based on "substantial evidence" does not rest on a foundation of prior administrative rulemaking case law. Rather, the "substantial evidence" provision reflects the legislature's injection of "adjudicatory concepts of evidentiary proof ... into the realm of non-judicial rulemaking," an approach recently adopted by a number of other jurisdictions in addition to Utah. *Little v. Traynor*, 565 N.W.2d 766, 772 (N.D.1997); *see also, e.g., U.S. West Communications, Inc. v. Colorado Pub. Util. Comm'n*, 978 P.2d 671, 675 (Colo.1999); *ACT–UP Triangle v. Comm'n for Health Servs.*, 345 N.C. 699, 483 S.E.2d 388, 392 (1997); *Hotel Ass'n of Washington, D.C. v. District of Columbia Mini-mum Wage & Indus. Safety Bd.*, 318 A.2d 294, 311 n. 24 (D.C.1974). Accordingly, because the "substantial evidence" provision represents the legislature's insertion of an adjudicative concept into the Rulemaking Act, the standard of review for challenges lodged pursuant to this provision must derive from our case law interpreting the analogous provision in the state's administrative adjudication statute, the Utah Administrative Procedures Act. *See* Utah Code Ann. § 63–46b–16(g) (1997).

¶ 21 Under the Utah Administrative Procedures Act, substantial evidence "is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank of Boston v. County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990); *see also Larson Limestone Co. v. State, Div. of Oil, Gas & Mining*, 903 P.2d 429, 430 (Utah 1995). Consequently, in determining whether a rule is supported by substantial evidence, courts must decide if the relevant findings were "reasonable and rational," although such an assessment "does not constitute a de novo review or a reweighing of the evidence." *Id.* at 430, 431; *see also Questar Pipeline Co. v. Utah State Tax Comm'n*, 850 P.2d 1175, 1178 (Utah 1993); *Utah Dep't of Admin. Servs. v. Pub. Serv. Comm'n*, 658 P.2d 601, 608–09 (Utah 1983). Moreover, the party challenging the rule's findings must marshal "all of the evidence supporting the findings and show that despite the supporting facts, the ... findings are not supported by substantial evidence." *First Nat'l Bank of Boston*, 799 P.2d at 1165.

¶ 22 In this case, the district court followed precisely the standard of review outlined by our previous substantial evidence cases, finding that the rule should be upheld if the " 'quantum and quality' " of evidence the Board relied upon was " 'adequate to convince a reasonable mind to support [the agency's] conclusion.' " (Quoting *First Nat'l Bank of Boston*, 799 P.2d at 1165.) Accordingly, we hold that the court applied the appropriate standard of review to its examination of AGC's "substantial evidence" challenge.

## II. STATUTORY CONFORMITY

¶ 23 Having determined the appropriate standards of review pursuant to the Rule-making Act, we now turn to AGC's contention that the Board's rule violates the Mining Act by failing to conform "with either the language or intent of the Act." Specifically, AGC argues that the Board's rule must be invalidated (1) because the Board did not define sand, gravel, and rock aggregate economically in terms of the materials' lack of "unique value ... in relation to [their] surrounding material," and (2) because the rule differentiates between unconsolidated and consolidated materials while the Mining Act does not. As explained above, *see supra* ¶¶ 18–19, we will set aside the Board's definitions under the Mining Act "only if they are imposed arbitrarily and capriciously or are beyond the tolerable limits of reason." *Williams v. Pub. Serv. Comm'n,* 754 P.2d 41, 50 (Utah 1988).

### A. Economic versus Geological Definitions

¶ 24 AGC's first argument is that the Board's rule must be invalidated because it does not define sand, gravel, and rock aggregate in economic terms, namely, as materials that lack "unique value in relation to [their] surrounding materials." In support of this argument, AGC contends that courts have defined sand, gravel, and rock aggregate based on the same economic definition AGC asserts the Board should have adopted in this case. For example, AGC cites to the United States Supreme Court's decision in *Watt v. Western Nuclear, Inc.* for the proposition that gravel is not a "mineral," 462 U.S. 36, 40–43, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983), and to this court's decision in *State Land Board v. State Department of Fish & Game* as support for the proposition that minerals are comprised of " 'any form of earth, rock or metal of greater value ... than the enclosing country of the superficial soil,' " while sand and gravel are "ordinary materials of the earth's surface." 17 Utah 2d 237, 239 & n. 3, 408 P.2d 707, 708 & n. 3 (1965) (citation omitted).

¶ 25 The Board, however, determined in its formal rulemaking process that it was more appropriate to define sand, gravel, and rock aggregate using geological terms. Noting that the Mining Act contemplates geological definitions of its terms, the Board found: "The ... definitions of 'sand, gravel[,] and rock aggregate' ... are rationally based on substantial geological evidence and, as such, are entirely consistent with the letter and intent of the [l]egislative exemption in the Act for 'sand, gravel[,] and rock aggregate' operations." Lowell Braxton, director of the Division, likewise testified before the Board: "The [l]egislature exempted from regulation ... sand, gravel, and rock aggregate ..., again, with no mention of end use."

¶ 26 Examining the Board's rule in view of the Mining Act's language and intent, we conclude that the Board did not act arbitrarily and capriciously by defining sand, gravel, and rock aggregate in geological rather than economic terms. Importantly, as the Board correctly noted, the Mining Act defines many of its terms in geological parlance. "[M]ineral deposit," for instance, is defined under the Act as "an accumulation of mineral matter in the form of consolidated rock, unconsolidated material, solutions, or otherwise occurring on the surface, beneath the surface, or in the waters of the land." Utah Code Ann. § 40–8–4(3)(a). Similarly, the Act defines "[l]and affected" as "the surface and subsurface of an area within the state where mining operations are being or will be conducted." *Id.* § 40–8–4(7). And "[r]eclamation" is defined as "actions performed during or after mining operations to shape, stabilize, revegetate, or otherwise treat the land affected in order to achieve a safe, stable, and ecological condition and use which will be consistent with local environmental conditions." *Id.* § 40–8–4(14). Given the legislature's own use of geological parlance in defining many of the Mining Act's terms, the Board's determination that sand, gravel, and rock aggregate should also be defined in such terms clearly is not "beyond the tolerable limits of reason." *Williams,* 754 P.2d at 50. On the contrary, the Board's use of geological terms in defining sand, gravel, and rock aggregate merely follows the definitional framework set out by the Act itself—a process that does not violate the

Act, but instead fully conforms to its intent and purpose. *See id.* at 51.

■■■ ¶ 27 Moreover, AGC's contention that the Board should have relied on economically-based, judicially-crafted definitions of sand and gravel in defining the Mining Act's terms is misplaced. As we have repeatedly stated, statutes must be construed not from interpretations of their terms in extraneous contexts, but from "the plain language of the Act" itself. *Jensen v. Intermountain Health Care, Inc.,* 679 P.2d 903, 906 (Utah 1984); *see also City of Hildale v. Cooke,* 2001 UT 56, ¶ 36, 28 P.3d 697; *Hall v. Utah State Dep't of Corr.,* 2001 UT 34, ¶ 15, 24 P.3d 958; *Morton Int'l, Inc. v. Auditing Div. of Utah State Tax Comm'n,* 814 P.2d 581, 587 (Utah 1991); *Dunn v. Bryan,* 77 Utah 604, 610, 299 P. 253, 255 (1931). Indeed, the cases on which AGC relies do not even purport to construe the Mining Act's use of the terms sand, gravel, and rock aggregate. Rather, the United States Supreme Court's holding in *Western Nuclear* dealt with the federal Stock Raising Homestead Act of 1916, *see* 462 U.S. at 38, 103 S.Ct. 2218, and our decision in *State Land Board* addressed a since-repealed Utah statute that did not concern mining at all. *See* 17 Utah 2d at 238, 408 P.2d at 708. Further, we have already refused to adopt an economic interpretation of the Mining Act's sand, gravel, and rock aggregate exemption. In *Larson Limestone Co. v. State, Division of Oil, Gas & Mining,* we rejected, as an interpretation of the exclusion that would swallow the Act whole, a quarrying company's argument that its operations should have been exempt under the statute due to their end use and economic value. 903 P.2d 429, 431–32 (Utah 1995). We held:

> Larson's argument that it is a rock aggregate company because a commercial market exists for its overburden would mean that virtually any "mining operation" could avoid regulation simply by selling its over-

burden. . . . Under Larson's theory, the operators of a gold mine could remove gold from the limited mining areas, sell their waste as rock aggregate, and avoid posting the $50,000 reclamation surety, regardless of the actual size of the area disturbed by the total mining effort. Clearly, the Utah legislature did not intend to permit circumvention of the Act in this fashion.

*Id.* at 432. Accordingly, based on our long-standing requirement that statutes be construed using their own plain language—along with our previous refusal in *Larson Limestone* to accept an economic interpretation of the Mining Act—we reject AGC's argument that the Board acted arbitrarily and capriciously by refusing to define sand, gravel, and rock aggregate in economic terms as materials that lack "unique value . . . in relation to [their] surrounding material[s]." [5]

### B. Consolidated versus Unconsolidated Materials

¶ 28 AGC's second argument is that the Board violated the Mining Act by impermissibly differentiating between unconsolidated and consolidated materials in defining sand, gravel, and rock aggregate. Specifically, AGC contends that because the Mining Act's definition of mineral deposit "groups consolidated and unconsolidated materials together," the Board violated the Act by defining sand, gravel, and rock aggregate to include only unconsolidated to moderately consolidated materials.

¶ 29 AGC correctly notes that the Mining Act's definition of mineral deposit includes both unconsolidated and consolidated materials. The relevant provision of the statute states, " 'Deposit' or 'mineral deposit' means an accumulation of mineral matter in the form of *consolidated* rock, *unconsolidated* material, solutions, or otherwise occurring on the surface, beneath the surface, or in the waters of the land. . . ." Utah Code Ann.

---

5. AGC also argues that the Board's rule violates the Mining Act by reading the terms sand, gravel, and rock aggregate together rather than separately because, according to AGC, rock aggregate is a "commercial term" with no independent geologic meaning. However, AGC never raised this argument before the district court and therefore waived its right to raise the issue on appeal.

*Treff v. Hinckley,* 2001 UT 50, ¶ 15, 26 P.3d 212; *see also, e.g., State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346; *Malibu Inv. Co. v. Sparks,* 2000 UT 30, ¶ 34, 996 P.2d 1043; *Certified Sur. Group, Ltd. v. UT Inc.,* 960 P.2d 904, 906 n. 3 (Utah 1998); *State Farm Mut. Auto. Ins. Co. v. Clyde,* 920 P.2d 1183, 1185 (Utah 1996). Accordingly, we do not address this contention.

§ 40–8–4(3)(a) (emphasis added). Despite the Act's inclusion of both consolidated and unconsolidated materials in its definition of mineral deposit, however, AGC's assertion that an acceptable definition of sand, gravel, and rock aggregate must similarly include both consolidated and unconsolidated materials is supported neither by the language of the Mining Act nor by logic.

¶ 30 When construing the language of a statutory provision, "[w]e presume that the legislature used each word advisedly. . . ." *Nelson v. Salt Lake County,* 905 P.2d 872, 875 (Utah 1995). Indeed, we will not "infer substantive terms into the text that are not already there. Rather, the interpretation must be based on the language used, and [we have] no power to rewrite the statute to conform to an intention not expressed." *Berrett v. Purser & Edwards,* 876 P.2d 367, 370 (Utah 1994). In this case, the legislature amended the Mining Act to exclude sand, gravel, and rock aggregate but, in doing so, did not tether this exclusion to the terms of the statute's definition for mineral deposit. Instead, the Act now simply states, " 'Deposit' or 'mineral deposit' excludes sand, gravel, [and] rock aggregate. . . ." *Id.* § 40–8–4(3)(b). Under AGC's interpretation, however, the Act's exclusion would effectively be rewritten to state, " 'Deposit' or 'mineral deposit' excludes sand, gravel, [and] rock aggregate[, *which include both consolidated rock and unconsolidated material*]." *Id.* Such an interpretation would not only "fl[y] in the face of this court's 'fundamental duty to give effect, if possible, to every word of the statute,' " *Arredondo v. Avis Rent A Car Sys., Inc.,* 2001 UT 29, ¶ 13, 24 P.3d 928 (quoting *Carlie v. Morgan,* 922 P.2d 1, 4 (Utah 1996)), but it would render meaningless our long followed canon of construction that we will not "infer substantive terms into the text that are not already there." *Berrett,* 876 P.2d at 370. Therefore, notwithstanding AGC's urging otherwise, we decline the invitation to tread on such treacherous ground. Accordingly, we hold that the Board's inclusion of only one subset of minerals—namely, "unconsolidated to moderately consolidated" materials—in its definitions of sand, gravel, and rock aggregate does not constitute an unreasonable interpretation of the Act's exclusionary provision. Utah Admin. Code R647–1–106. The Board did not act arbitrarily and capriciously in promulgating its rule. *See Williams,* 754 P.2d at 50–51.[6]

### III. SUBSTANTIAL EVIDENCE

¶ 31 AGC's next contention on appeal is that the Board's rule is not supported by substantial evidence. More particularly, AGC alleges that the Board promulgated a rule that "has no support . . . in the geological industry terminology presented during the rulemaking."

¶ 32 As noted above, *see supra* ¶¶ 20–22, substantial evidence is the "quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank of Boston v. County Bd. of Equalization,* 799 P.2d 1163, 1165 (Utah 1990). Consequently, the Utah Administrative Rulemaking Act requires reviewing courts to assess substantial evidence challenges by examining the relevant findings "in light of the whole administrative record." Utah Code Ann. § 63–46a–12.1(4)(a)(ii). Moreover, the party challenging the findings is required to marshal "all of the evidence supporting the findings and show that despite the supporting facts, the . . . findings are not supported by substantial evidence." *First Nat'l Bank of Boston,* 799 P.2d at 1165. If a party "fail[s] to satisfy [its] burden of marshaling the evidence and showing that the [agency]'s finding[s][are] not supported by substantial evidence, we [will] affirm the [agency]'s findings." *Nelson v. Bd. of Equalization,* 943 P.2d 1354, 1356 (Utah 1997); *see also S. Cent. Utah Tel. Ass'n v. Auditing Div. of Utah State Tax*

---

**6.** AGC asserts that it also challenges the Board's rule based on the contention that the Board exceeded its authority in promulgating its definitions of sand, gravel, and rock aggregate. However, AGC hinges this contention solely upon its argument that the rule violates the language and intent of the Mining Act. Accordingly, because we have already determined that the rule fully conforms to the Mining Act, *see supra* ¶¶ 23–30, we do not separately address AGC's argument that the Board exceeded its authority in promulgating the rule.

*Comm'n,* 951 P.2d 218, 226 (Utah 1997); *Hales Sand & Gravel, Inc. v. Audit Div. of State Tax Comm'n,* 842 P.2d 887, 893 (Utah 1992).

¶ 33 In this case, the Board specifically found its definitions of sand, gravel, and rock aggregate to be "based on substantial geological evidence." Most significantly, Lowell Braxton's testimony during the Board's rulemaking process recognized that in drafting its definitions, the Board relied on "two widely recognized geologic source materials" produced by the American Geological Institute and the United States Bureau of Mines. Indeed, Mr. Braxton stated that the Board's definitions of sand and gravel "closely mirror[ ]" the definitions found in those organizations' source materials. Similarly, the Board's definition of rock aggregate also relies on these geological definitions. In fact, representatives of Utah County, who opposed the rule, complained to the Board that its proposed definition of rock aggregate was too much "like a standard geology definition," and therefore urged the Board to rely on economically oriented definitions rather than "[s]tandard technical definitions found in geology and engineering texts...."

¶ 34 On appeal, AGC attempts to attack this evidence as inadequate to support the Board's finding that its definitions were "based on substantial geological evidence." In doing so, however, AGC utterly fails to marshal the evidence in support of the Board's finding. Rather, AGC baldly asserts—without ever explaining why the evidence the Board did rely on does not support the rule—that the Board "completely ignored the *authoritative* testimony presented to it." (Emphasis added.) Such an approach simply cannot satisfy AGC's burden of "show[ing] that despite the supporting

facts, the ... [Board's] finding[ ][is] not supported by substantial evidence." *First Nat'l Bank of Boston,* 799 P.2d at 1165. Indeed, the record clearly indicates that the Board received evidence from which it could have properly concluded its definitions were supported by substantial geological evidence. "To demonstrate otherwise, [AGC] is required to marshal [that] evidence, not simply attack its credibility" as not "authoritative." *Brewer v. Denver & Rio Grande W. R.R.,* 2001 UT 77, ¶ 36, 31 P.3d 557. Therefore, we affirm the district court's determination that the Board's rule is supported by substantial evidence. *See, e.g., Nelson,* 943 P.2d at 1356; *Hales Sand & Gravel,* 842 P.2d at 893.[7]

## IV. DISCOVERY

¶ 35 Finally, AGC argues that the district court erred by issuing its March 8, 1998, protective order, which disallowed AGC from pursuing discovery in the case and limited the court's review of the Board's rule to the administrative record. AGC contends that discovery was necessary in this case because the Board considered "a number of letters and other similar written materials" in promulgating the rule that were not included in the administrative record. However, despite its contention that discovery was necessary in this case, AGC has offered no legal authority, evidence, or other analysis in support of its position.

¶ 36 This court has repeatedly stated that " '[a] reviewing court is entitled to have the issues clearly defined with pertinent authority cited....' " *State v. Bishop,* 753 P.2d 439, 450 (Utah 1988) (quoting *Williamson v. Opsahl,* 92 Ill.App.3d 1087, 48 Ill.Dec. 510, 416 N.E.2d 783, 784 (1981)). Indeed, Utah Rule

---

7. AGC also argues on appeal that the Board's definition of rock aggregate, specifically, was not supported by the "authoritative testimony" presented before the Board during the rulemaking. However, AGC never raised this argument before the district court, and thus waived its right to raise the issue on appeal. *Treff v. Hinckley,* 2001 UT 50, ¶ 15, 26 P.3d 212; *see also, e.g., State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346; *Malibu Inv. Co. v. Sparks,* 2000 UT 30, ¶ 34, 996 P.2d 1043; *Certified Sur. Group, Ltd. v. UT Inc.,* 960 P.2d 904, 906 n. 3 (Utah 1998); *State Farm Mut. Auto. Ins. Co. v. Clyde,* 920 P.2d 1183, 1185 (Utah 1996). Moreover, we note that given the weighty geological evidence offered in support of the Board's definitions of sand and gravel, this argument is in actuality simply a rehash of AGC's earlier contention that the Board's rule violated the intent of the Mining Act by reading the terms sand, gravel, and rock aggregate together rather than separately. Importantly, we have already determined that AGC waived this contention by never raising it before the district court. *See supra* note 5. Accordingly, we decline to address it here.

of Appellate Procedure 24 unambiguously requires, "[Appellant's brief] shall contain the contentions and reasons of the appellant with respect to the issues presented, including ... citations to the authorities, statutes, and parts of the record relied on." Utah R.App. P. 24(a)(9). Accordingly, "[i]t is well established that a reviewing court will not address arguments that are not adequately briefed." *State v. Thomas*, 961 P.2d 299, 304 (Utah 1998).

¶ 37 In this case, AGC has wholly failed to comply with the requirements of rule 24. AGC's brief lacks even a single reference to a relevant statutory provision, judicial decision, procedural rule, or record citation; its discovery argument is cursory and superficial at best, "perfunctory and slap-dash at worst." *State v. Thomas*, 1999 UT 2, ¶ 13, 974 P.2d 269. Therefore, we once again refuse to become " 'simply a depository in which the appealing party may dump the burden of argument and research' "; we will not address AGC's discovery argument. *Bishop*, 753 P.2d at 450 (quoting *Opsahl*, 48 Ill.Dec. 510, 416 N.E.2d at 784).[8]

### CONCLUSION

¶ 38 We conclude that the district court did not err by granting summary judgment in favor of the Board, and thus, upholding the Board's final rule. In so doing, the court employed the appropriate standards of review under the Rulemaking Act, and correctly determined that the Board's definitions were not promulgated arbitrarily and capriciously and were supported by substantial evidence. Therefore, the judgment of the district court is affirmed.

¶ 39 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Associate Chief Justice RUSSON's opinion.

8. *Accord, e.g., State v. Norris*, 2001 UT 104, ¶ 28, —— P.3d ——; *State v. Lusk*, 2001 UT 102, ¶ 35, 37 P.3d 1103; *State v. Bisner*, 2001 UT 99, n. 5, 37 P.3d 1073; *Featherstone v. Schaerrer*, 2001 UT 86, n. 11, 34 P.3d 194; *Brewer*, 2001 UT 77 n. 4, 31 P.3d 557; *Green v. Louder*, 2001 UT 62, ¶ 34, 29 P.3d 638; *State v. Butterfield*, 2001 UT 59, n. 3, 27 P.3d 1133; *Treff*, 2001 UT 50 at ¶ 11, 26 P.3d 212; *State v. Vargas*, 2001 UT 5, ¶ 42, 20 P.3d 271; *Ellis v. Swensen*, 2000 UT 101, ¶¶ 16–18, 16 P.3d 1233; *Gorostieta v. Parkinson*, 2000 UT 99, ¶¶ 43–44, 17 P.3d 1110; *State v. Helmick*, 2000 UT 70, ¶ 7, 9 P.3d 164; *Thomas*, 1999 UT 2 at ¶ 13, 974 P.2d 269; *State v. Jaeger*, 1999 UT 1, ¶ 31, 973 P.2d 404; *Child v. Gonda*, 972 P.2d 425, 430 (Utah 1998); *Thomas*, 961 P.2d at 304; *Jensen v. IHC Hosps., Inc.*, 944 P.2d 327, 336–37 n. 6 (Utah 1997); *Monson v. Carver*, 928 P.2d 1017, 1024 (Utah 1996); *Crossroads Plaza Ass'n v. Pratt*, 912 P.2d 961, 969 n. 5 (Utah 1996); *Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co.*, 909 P.2d 225, 230–31 (Utah 1995); *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 461 (Utah 1993); *see also MacKay v. Hardy*, 973 P.2d 941, 948 n. 9 (Utah 1998) (giving examples of the "disconcertingly legion" number of inadequately briefed cases).