**2016 UT App 151**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAWN ANN DRAPER-ROBERTS,
Appellant.

Opinion
No. 20141057-CA
Filed July 21, 2016

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 141902608

John B. Plimpton and Steffen Soller, Attorneys
for Appellant

Simarjit Gill and Craig N. Stanger, Attorneys
for Appellee

SENIOR JUDGE PAMELA T. GREENWOOD authored this Opinion, in
which JUDGE J. FREDERIC VOROS JR. and SENIOR JUDGE JUDITH M.
BILLINGS concurred. [1]

GREENWOOD, Senior Judge:

¶1      Defendant Dawn Ann Draper-Roberts appeals after a jury
found her guilty of theft, a class A misdemeanor. *See* Utah Code
Ann. §§ 76-6-404, -412(1)(c)(i) (LexisNexis 2012). She argues that
the trial court should have granted one or more of her several
motions for a mistrial. We agree and therefore reverse and
remand for a new trial.

---

1. Senior Judges Judith M. Billings and Pamela T. Greenwood sat
by special assignment as authorized by law. *See generally* Utah R.
Jud. Admin. 11-201(6).

BACKGROUND[2]

¶2    Defendant worked at a craft store, where she found a customer's purse in a shopping cart. Rather than immediately locking the purse in the store's safe, she put it in the store's classroom where there were locking cabinets and where she was working that day.

¶3    When the customer realized her purse was missing, she returned to the store and asked three employees if they had seen the purse. None of the employees reported knowing where the purse was. One of the employees—the acting manager—used the store's radio headset system to ask if any employees had found the purse. No one responded. The acting manager recorded the customer's contact information, and the customer left. The acting manager testified that she spoke to Defendant within a few minutes of the customer's departure, asking if she had seen the purse. According to the acting manager's testimony, Defendant indicated that she had not.

¶4    Meanwhile, at home, the customer used the Find My iPhone application on her iPad to determine the location of her iPhone, which was inside her missing purse. The application showed that her phone was still inside the craft store. She used the application to set off an alarm on her phone, and her husband informed police that she was returning to the store to look for her purse.

¶5    Around the same time, back at the store, Defendant brought the acting manager the customer's purse, from which

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Bluff*, 2002 UT 66, ¶ 2, 52 P.3d 1210 (citation and internal quotation marks omitted).

the sound of the iPhone's alarm was emitting. The acting manager put the purse in the store safe. Police arrived, took possession of the purse, and "continued the investigation to obtain facts to write a report." When the customer again returned to the store, police returned her purse to her; "nothing was missing from or disturbed in it."

¶6    The officer who investigated the case questioned Defendant about where she found the purse and worked with her to obtain the store's surveillance video. The video showed that Defendant had found the purse in a different area of the store than where she had initially told the officer. At trial, the officer described Defendant as uncooperative, hostile, and suspicious.[3]

¶7    Also at trial and during the officer's testimony, it became apparent that the State possessed video retrieved from the officer's body camera (the body cam video) that Defendant had not been provided as part of the State's discovery. Defendant moved for a mistrial, arguing that "the video shows potentially exculpatory evidence" and that defense counsel "would have prepared for this trial in a completely different manner if [he] had the video available beforehand like [he] should have had." Defense counsel further explained that even if the video was not

---

3. Importantly, for reasons that are discussed in detail below, *see infra* ¶¶ 21–24, the officer also specifically testified that he "had asked [Defendant] where she found the purse, at which point she really didn't want to talk to [him] about it. She just started asking [him] questions." He also testified, "And then I asked her for just some basic information. Okay, what's your name, so I can put this down? She is -- she didn't want to give me her name at first." Video taken from the officer's body camera, however, tells a different story—a fact critical to our determination of harm and our ultimate reversal.

exculpatory and was in fact incriminating, "it would change the way that [he] ask[ed] questions, how [he] approach[ed] the case, how [he] advise[d] [his] client as to her rights, [and] whether or not she should take a plea offer."

¶8    The trial court denied Defendant's motion for a mistrial and instead gave "[d]efense counsel the evening and the rest of the afternoon to go over th[e] video as many times as he need[ed] to, to queue it up to where he need[ed] to . . . , and to be ready for cross-examination [the next day]." The court then adjourned for the day at 2:45 p.m., with proceedings set to begin at 10:00 a.m. the following morning. When trial recommenced, Defendant renewed her motion for a mistrial, which the trial court again denied.

¶9    Aside from the revelation of the body cam video, two other events at trial are relevant to our review. During jury voir dire, the prosecutor named only three witnesses—the officer, the customer, and the store manager, who had been out of town during the events at issue—and those were the only witnesses about whom the court asked the jury, "Are any of you acquainted with or related to any of those people mentioned?" However, after defense counsel finished his opening statement, the State informed the court that the acting manager would also be testifying, explaining, "There is a witness that we did not think was available, that is." When the prosecutor mentioned this fourth witness—the acting manager—defense counsel responded with what is only marked as "inaudible" in the transcript. The prosecutor responded, "She is in the police report," to which defense counsel argued, "I asked him two days ago who the witnesses are going to be, and he named three witnesses." The trial court allowed the acting manager to testify.

¶10    Finally, Defendant again moved for a mistrial after the State decided not to have the store manager testify. During Defendant's opening statement, defense counsel had previewed

some of the exculpatory testimony he anticipated the store manager would provide. Namely, he expected the store manager to testify that she had known Defendant for ten years, that she knew Defendant to be a good employee, and that she had never had any problems with her. When the State announced that it would not have the store manager testify, Defendant objected, but the trial court released the witness because the State—and not Defendant—had subpoenaed her to testify. Defendant moved for a mistrial, arguing that the State opted not to have the store manager testify because it knew she would provide testimony beneficial to Defendant. The trial court denied the motion.

¶11 The jury found Defendant guilty of theft. She now appeals her conviction.

## ISSUES AND STANDARDS OF REVIEW

¶12 Defendant raises four issues on appeal. First, she argues that the trial court erred by denying her motions for a mistrial to remedy the State's failure to give Defendant the body cam video before trial. "'We review rulings on motions for a mistrial based on prosecutorial misconduct [i.e., discovery violations] for abuse of discretion.'" *State v. Martinez*, 2002 UT App 126, ¶ 16, 47 P.3d 115 (alteration in original) (quoting *State v. Reed*, 2000 UT 68, ¶ 18, 8 P.3d 1025).

¶13 Second, Defendant argues that the trial court erred when it allowed the acting manager to testify despite the State's failure to disclose her as a witness prior to trial. We review the trial court's decision to allow the acting manager to testify for an abuse of discretion.[4] *See State v. Perea*, 2013 UT 68, ¶ 31, 322 P.3d

---

4. There is some question about whether Defendant preserved this challenge for our review. Defendant asserts that even if it

(continued…)

624 ("[W]e give the district court broad discretion to admit or exclude evidence, including lay witness testimony, and will disturb its ruling only for abuse of discretion." (citation and internal quotation marks omitted)).

¶14 Third, Defendant argues that the trial court should have required the store manager—who had been subpoenaed by the State and was present at trial—to remain in court and testify, even though the State indicated it would not need her testimony. In her brief, Defendant suggests that we should review this issue for correctness, because the release of the store manager as a witness was based on the trial court's arguably incorrect "conclusion of law" "that a party cannot compel a witness who is present in court to testify without having subpoenaed the witness." (Citing Utah R. Civ. P. 45(j); *State v. Petersen*, 810 P.2d 421, 425 (Utah 1991); *McKelvey v. Hamilton*, 2009 UT App 126, ¶ 17, 211 P.3d 390.) The State's brief is unhelpful in determining

---

(…continued)

was not preserved, we should review the issue for plain error. *See, e.g., State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. "An issue is preserved for appeal only if it was presented to the trial court in such a way that the trial court had an opportunity to rule on it." *State v. Martinez*, 2015 UT App 193, ¶ 27, 357 P.3d 27. Admittedly, our determination of whether this issue was preserved is made more difficult because much of the discussion held at the bench about the witness is marked as "inaudible." But with context we are convinced that the issue was adequately presented to the trial court. *See supra* ¶ 9. Regardless, even if we were to review this issue for plain error, the result would be the same. Because defense counsel complained to the trial court that the witness was not disclosed as a potential witness, the error we identify should have been obvious; furthermore, as we make clear in our analysis, we believe this error prejudiced Defendant. *See infra* ¶¶ 40–45; *Holgate*, 2000 UT 74, ¶ 13.

what standard of review applies, as it suggests that "[n]o standard of review applies." After careful consideration of the parties' briefs and relevant law, we conclude that this particular question is one that should be reviewed for an abuse of discretion.[5] *See Miller v. Brocksmith*, 825 P.2d 690, 693 (Utah Ct. App. 1992) (explaining that when an issue "involves the trial court's discretionary power, . . . we will not disturb the trial court's decision in such matters absent a clear abuse of such

---

5. Defendant relies on rule 45 of the Utah Rules of Civil Procedure for the proposition that because the store manager was "[a] person present in court," she could have been "required to testify in the same manner as if the person were in attendance upon subpoena." *See* Utah R. Civ. P. 45(j). This is true. But the language of the rule makes clear that a person in the store manager's position *may* be required to testify. *See id.* "According to its ordinary construction the word 'may' means permissive," and thus the trial court had discretion to decide whether to have the store manager remain and testify. *See Crockett v. Crockett*, 836 P.2d 818, 820 (Utah Ct. App. 1992); *see also Kennon v. Air Quality Board*, 2009 UT 77, ¶ 21, 270 P.3d 417 ("The use of 'may,' a permissive term, indicates the legislature's intent to provide the Secretary with discretion."); *Vance v. Fordham*, 671 P.2d 124, 129 (Utah 1983) ("[T]he use of the permissive 'may' indicates that the publication of 'rules and regulations' is optional with the Committee."); *State v. Madsen*, 2002 UT App 345, ¶ 14, 57 P.3d 1134 ("Use of the permissive term 'may' plainly indicates that the trial court is not required to continue sentencing to obtain a presentence investigation report."). Furthermore, this court reviews lower courts' discretionary rulings for abuse of discretion. *See Miller v. Brocksmith*, 825 P.2d 690, 693 (Utah Ct. App. 1992); Michael J. Wilkins et al., *A "Primer" in Utah State Appellate Practice*, 2000 Utah L. Rev. 111, 130 (2000) ("The 'abuse of discretion' standard of review applies to all discretionary decisions of lower courts.").

discretion"). Defendant alternatively contends that the trial court should have granted the motion for a mistrial that she lodged after the trial court's release of the store manager. We also review this question for an abuse of discretion. *State v. Decorso*, 1999 UT 57, ¶ 38, 993 P.2d 837.

¶15    Finally, Defendant argues that "even if the errors raised [above] are not individually prejudicial, taken together they are cumulatively prejudicial." "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim of error . . . ." *State v. McNeil*, 2013 UT App 134, ¶ 16, 302 P.3d 844 (omission in original) (citation and internal quotation marks omitted), *aff'd*, 2016 UT 3, 365 P.3d 699.

ANALYSIS

¶16    For Defendant to succeed on any of her claims on appeal, she must show that the trial court abused its discretion. "Under the abuse of discretion standard, we determine whether the trial court's ruling was beyond the limits of reasonability. However, even if the trial court abused its discretion, we will reverse only if we find that the error is harmful." *State v. Archuleta*, 850 P.2d 1232, 1240 (Utah 1993) (citations and internal quotation marks omitted).

> An abuse of discretion occurs when, taking into account any remedial measures ordered by the trial court, the prejudice to the defendant still satisfies the standard for reversible error set forth in Rule 30 [of the Utah Rules of Criminal Procedure], and the remedial measures requested but refused would have obviated this prejudice.

*State v. Knight*, 734 P.2d 913, 918 (Utah 1987). If we determine the trial court abused its discretion but that no single error was harmful enough to require reversal, we will nevertheless reverse

if "the cumulative effect of all identified and assumed errors undermines our confidence in the essential fairness of the defendant's trial." *State v. Clark*, 2014 UT App 56, ¶ 13, 322 P.3d 761.

¶17   We begin with the question of whether the trial court abused its discretion in the ways identified by Defendant. Then, because we conclude that the trial court erred in each instance, we turn to the question of cumulative prejudice, making it unnecessary for us to determine whether any error alone merits reversal. This approach is particularly beneficial in this case, where each error was compounded by the next and the prejudicial effect of any single error is difficult to isolate.

## I. The Body Cam Video

¶18   Defendant first challenges the trial court's refusal to grant a mistrial when it came to light that the body cam video was not included with the discovery the State had provided Defendant. Under rule 16 of the Utah Rules of Criminal Procedure, "the prosecutor shall disclose to the defense upon request . . . relevant written or recorded statements of the defendant . . . [and] evidence known to the prosecutor that tends to negate the guilt of the accused." Utah R. Crim. P. 16(a). Furthermore, the State "has a continuing duty to make disclosure." *Id.* R. 16(b). "When the prosecution responds voluntarily to a discovery request, as it did here, two duties arise. First, the prosecution must either produce all of the material requested or specifically identify those portions that will not be produced." *State v. Redcap*, 2014 UT App 10, ¶ 12, 318 P.3d 1202. "'Second, when the prosecution agrees to produce any of the material requested, it must continue to disclose such material on an ongoing basis to the defense.'" *Id.* (quoting *Knight*, 734 P.2d at 917). "Failure to do so is a discovery violation." *Id.*

¶19   More than five months before trial, Defendant filed a discovery request with the State. She asked for all "evidence that

has been discovered by any member of the agencies involved in the investigation or prosecution that tends to inculpate the defendant," all "recorded statements of the defendant," and all "video and/or audio recordings and transcripts of those recordings prepared in conjunction with the prosecution of this case in the possession of any law enforcement or governmental agency." The State responded by providing Defendant with the store security camera footage. It did not provide the body cam video, and it did not "specifically identify" the body cam video as evidence that would not be provided. *See id.* There is no dispute that the State knew of the body cam video before trial and did not disclose the video until the middle of trial. We thus agree with Defendant that the State's failure to disclose or provide the body cam video is a discovery violation.[6]

---

6. In its brief, the State makes no attempt to argue that this was not a discovery violation. Instead, it ignores the substance of Defendant's rule 16 argument and claims that Defendant waived her rule 16 challenge "when she sought a mistrial and did not seek a continuance to meet the allegedly unexpected evidence." The State's argument fails to recognize that rule 16 does not require an aggrieved defendant to request a continuance. *See* Utah R. Crim. P. 16(g). Instead, a defendant must make "timely efforts to mitigate or eliminate the prejudice caused by the prosecutor's conduct." *See State v. Griffiths*, 752 P.2d 879, 883 (Utah 1988). This includes "request[ing] a continuance *or* seek[ing] other appropriate relief under Rule 16(g)." *State v. Rugebregt*, 965 P.2d 518, 522 (Utah Ct. App. 1998) (emphasis added). Because, as we conclude below, Defendant was entitled to a mistrial, we conclude that her motion for a mistrial was a request for "other appropriate relief." *See id.*; *see also* Utah R. Crim. P. 16(g) (providing that a trial court "may enter such other order as it deems just under the circumstances"). The State argues in the alternative that Defendant "invited the alleged

(continued…)

¶20　The question, then, is whether the trial court abused its discretion when it denied Defendant's request for a mistrial and opted instead to provide her with a brief continuance to review the body cam video and prepare to cross-examine the officer. In other words, was this course of action "beyond the limits of reasonability"? *See Archuleta*, 850 P.2d at 1240 (citation and internal quotation marks omitted).

¶21　We conclude that it was. Defense counsel was deprived of the ability to prepare for trial with the body cam video in mind. The video was revealed after opening statements—after counsel had presented the case to the jury and had made no mention of the video. Defense counsel had no reason or opportunity to seek out and interview the store employees and other police officers who appear in the video. The late disclosure of the body cam video impaired Defendant's ability to thoroughly review the contents of the video and research applicable law in order to effectively move to exclude portions of the video; instead, the video was admitted to the jury in its entirety. Aside from including potentially inadmissible hearsay statements, the video shows Defendant being arrested, being read her rights in

---

(…continued)

error in the ruling she now challenges by seeking the introduction of the body camera video after the trial court offered to exclude it and being granted a continuance for its inspection." This contention is wide of the mark. While Defendant briefly discussed the possibility of using the body cam video for impeaching the officer, it was the State who clearly indicated, "I would move to admit it." The State spends the remainder of its brief on this point analyzing the body cam video in the context of an alleged *Brady* violation. *See generally Brady v. Maryland*, 373 U.S. 83 (1963). But Defendant does not claim that a *Brady* violation occurred and instead couches her argument in terms of rule 16.

accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966), and invoking her rights to silence and counsel.

¶22 And perhaps most importantly, the video directly contradicts the officer's testimony on two points. To help explain why he came to view Defendant as a suspect in the case, the officer testified that Defendant "really didn't want to talk to [him] about" "where she found the purse." Instead, he explained, "She just started asking me questions." But in the body cam video, the acting manager asks Defendant to show the officer where the purse was found, at which point Defendant immediately walks the officer to the aisle where she purportedly found the purse, without asking him a single question. At trial, the officer testified, "And then I asked her for just some basic information. Okay, what's your name, so I can put this down? She is -- she didn't want to give me her name at first." But the body cam video shows no discernible reluctance to provide the officer with the information requested.[7] These small but

---

7. The body cam video reveals the following exchange, with virtually no pauses between questions and answers:

| | |
|---|---|
| The officer: | "Let me get some information from you." |
| Defendant: | "All right." |
| The officer: | "What was your name?" |
| Defendant: | "My name is Dawn." |
| The officer: | "Is it D-A-W-N?" |
| Defendant: | "Uh huh (affirmative)." |
| The officer: | "And your last name?" |
| Defendant: | "Draper-Roberts." |
| The officer: | "D-A-R-A-P-E-R . . ." |
| Defendant: | (interrupting, laughing) "Like the city, and then Roberts, yeah." |
| The officer: | "What's your birthday?" |
| Defendant: | [Provides her birthday.] |
| The officer: | "And a phone number for you?" |

(continued…)

revealing discrepancies represent aspects of the body cam video with which defense counsel could have become thoroughly familiar had the State produced the video before trial. Notwithstanding counsel's ability to scramble and include some questions about the body cam video in his cross-examination of the officer, "we are not persuaded that the defense was as effective as it would have been if" the body cam video was disclosed as it should have been. *See State v. Knight*, 734 P.2d 913, 922 (Utah 1987).

¶23 We acknowledge that the trial court provided Defendant with what the State repeatedly calls "a 19-hour continuance." More realistically, the trial court gave the defense approximately two hours more than it otherwise would have had to prepare for the second day of trial, recessing at 2:45 p.m. instead of, presumably, the close of business at 5:00 p.m. But whether the trial court provided Defendant with two or nineteen hours—or even more than that—the damage of the untimely disclosed body cam video was done. Defense counsel had already potentially lost credibility with the jury by failing to preview and discuss an important piece of evidence for the State in his opening statement. And, as defense counsel explained, he "would have prepared for this trial in a completely different manner if [he] had the video available beforehand like [he] should have had." Defense counsel further explained, "[I]t would change the way that I ask questions, how I approach the case, how I advise my client as to her rights, whether or not she should take a plea offer."

---

(…continued)

| | |
|---|---|
| Defendant: | "Um, besides work here?" |
| The officer: | "Yeah." |
| Defendant: | [Provides her phone number.] |
| The officer: | "[Repeating four digits]?" |
| Defendant: | "Uh huh (affirmative)." |

¶24    A continuance would not have cured the prejudice Defendant suffered from the State's failure to disclose the body cam video. Under these circumstances, it was erroneous for the trial court to deny Defendant's motion for a mistrial. *See id.* at 918 ("[I]f the trial judge denies the relief requested under Rule 16(g), that denial may constitute an abuse of discretion warranting a reversal.").

## II. The Acting Manager

¶25    Defendant's next contention is that the trial court should not have allowed the acting manager to testify. The Utah Rules of Criminal Procedure require the prosecutor to provide the names of witnesses to a defendant before trial.

> The names of witnesses on whose evidence an indictment or information was based shall be endorsed thereon before it is filed. . . . Upon request the prosecuting attorney shall, except upon a showing of good cause, furnish the names of other witnesses he proposes to call whose names are not so endorsed.

Utah R. Crim. P. 4(j). Furthermore, under rule 16 of the Utah Rules of Criminal Procedure, the State was required to respond in full to Defendant's request for a list of all witnesses the State intended to call at trial. *See id.* R. 16(a).

¶26    The State disclosed that it intended to call the customer, the officer, and the store manager as witnesses. It did not mention the acting manager until after opening statements. The State now claims that "the Information filed endorses 'store manager' as a witness." But the fact that the State subpoenaed and had present at trial the actual store manager leads us to reject the State's contention that, "[w]hile not entirely descript[ive], it is reasonable for [Defendant] to expect that [the acting manager]—who was the only other store manager on

duty at the time of this offense—could be called as a witness." We thus have no difficulty concluding that the State's failure to disclose the acting manager as a potential witness constitutes a second discovery violation. *See Knight*, 734 P.2d at 916–17 (explaining that where the defendant requested a "list of all the witnesses that the State intends to call for trial" and the State chose "to respond voluntarily to [the] request under [rule 16(a)(5)] without requiring the defense to obtain a court order, considerations of fairness require[d] that the prosecution respond to the request in a manner that [would] not be misleading").

¶27    To decide whether it was error for the trial court to allow this testimony in spite of the State's failure to disclose the acting manager as a witness, we consider the substance of the acting manager's testimony along with relevant extraneous information about the witness. But first, we examine the elements of theft that the State was required to prove, so as to better place the acting manager's testimony in context.

¶28    "A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." Utah Code Ann. § 76-6-404 (LexisNexis 2012). Thus, for the jury to convict Defendant, the State had to prove beyond a reasonable doubt that Defendant (1) exercised unauthorized control over the purse, and (2) had a specific intent in doing so—to deprive the customer of her purse. *See id.*

¶29    While the surveillance video revealed that Defendant undoubtedly exercised control over the purse, the State was required to show that the control was unauthorized and that Defendant intended to deprive the customer of her purse. The video showed that Defendant found the purse by the door of the store, when instead she told the officer she had found it in an aisle. And the officer's testimony indicated that the control was

unauthorized and with the intent to deprive the customer by explaining to the jury the ways in which Defendant behaved suspiciously. But the most telling piece of evidence regarding Defendant's intent came from the acting manager's testimony. The State summarizes what is perhaps the most important part of the acting manager's testimony this way: "[The acting manager] spoke to [Defendant]—in person—within a 'few minutes' of [the customer] leaving and asked [Defendant] if she had seen a purse and [Defendant] indicated she had not." The acting manager is the only witness who testified that Defendant denied seeing the purse.[8] Without her testimony, the jury might have believed that Defendant—an acting manager herself—had done nothing more than move the forgotten purse from the public area of the store into, as the officer described, "a bigger room . . . . That's kind of an employee area. That wouldn't be somewhere that customers would walk back into." Without the acting manager's testimony, the most incriminating piece of evidence would be the contradiction between where Defendant actually found the purse and where she told the officer she had found it. The acting manager's testimony was crucial to the State's case, and allowing her to testify without adequate notice to Defendant was erroneous.

---

8. At oral argument, the State even acknowledged how important this testimony was. Counsel for the State explained, "My main argument in the case was that initially there was no problem. [Defendant]'s a manager. She can retrieve a mislaid item and store it. . . . It was at the point, I argued to the jury, . . . where she denied its existence when the [customer] . . . came back in." He claimed that this was based on the customer's testimony, but when pressed, he acknowledged that it was the acting manager who testified of her conversation with Defendant in which Defendant denied having seen the purse.

¶30 Beyond the substance of the acting manager's testimony, another important fact informs our conclusion that the trial court erred in allowing the acting manager's testimony. The acting manager has a criminal history—a felony conviction for retail theft in 2010.[9] Rule 609 of the Utah Rules of Evidence allows "attacking a witness's character for truthfulness by evidence of a criminal conviction" if the crime committed "was punishable by death or by imprisonment for more than one year" or "if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Utah R. Evid. 609(a). It seems likely that if Defendant had had the opportunity to fully prepare for the acting manager's testimony, she would have discovered and sought admission of the acting manager's theft conviction. And under rule 609, the conviction likely would have been admitted to impeach the acting manager's testimony.

¶31 The State's failure to include the acting manager on its list of witnesses was a discovery violation. Given the importance of the acting manager's testimony and her felony conviction, it was an abuse of the trial court's discretion to allow the acting manager's testimony.

---

9. Because Defendant did not have the opportunity to prepare for the acting manager's testimony before trial, the acting manager's criminal history was not presented to the trial court and, accordingly, no objection was made on this basis. Defendant nevertheless encourages us to take judicial notice of the acting manager's criminal history. Especially in light of the State's concession at oral argument that judicial notice is proper in this context, we accept Defendant's invitation.

III. The Store Manager

¶32    Finally, Defendant challenges the trial court's release of the store manager as a witness, when she had been subpoenaed by the State and was present in court. As discussed above, this was undoubtedly a discretionary ruling by the trial court. *See supra* note 5. But it is also undisputed that the trial court had the authority to require the store manager to testify, even though Defendant had not subpoenaed her. *See* Utah R. Civ. P. 45; *see also State v. Hartman*, 119 P.2d 112, 114 (Utah 1941) ("The court could and should have ordered [a person present at trial] to remain as a witness—upon request of counsel for defendant."). The question, then, is given that authority, should the trial court have required the store manager to remain and testify? In light of the other errors identified above, we conclude that it should have.

¶33    The trial court's initial justification for allowing the store manager to leave and not testify was that Defendant had not subpoenaed the store manager. Defense counsel explained that usually he relies on the State's subpoenas in preparing for trial, and the court replied, "Usual practice is not going to cut it, and I have already called both the director of LDA and the director of the DA's office about this issue in the past. There is no agreement that you can rely on who the State subpoenas." While this might be a legitimate concern at the trial court level, and while the involved offices might need to adjust their standard practice, the trial court failed to explain why in this particular case Defendant should not have had the opportunity to examine the store manager. More concerning, the trial court went on to chastise, "If you wanted them, you should have subpoenaed them," before indicating what appears to be a significant, though nonlegal, factor in the court's decision: "But, like I said, we need to be done by 4:00, so I'm going to limit --."

¶34 After denying a motion for a mistrial based on the State's failure to disclose the body cam video and then allowing a witness who had not been disclosed by the State to testify, the trial court prohibited Defendant from questioning a witness—who was present in court and was expected to testify positively about Defendant—at least in part based on the court's self-imposed time schedule. This is precisely the sort of "discretionary ruling that compounds a previous harmful error of law [and thus] constitutes an abuse of discretion." *See State v. Norris*, 2002 UT App 305, ¶ 12, 57 P.3d 238.

IV. Prejudice

¶35 Because we have concluded that the trial court erred in denying Defendant's motion for a mistrial based on the mid-trial production of the body cam video, allowing the acting manager to testify, and releasing the store manager from testifying, we now consider whether the cumulative effect of these errors undermines our confidence that Defendant received a fair trial. *See State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993).

A. The State's Burden

¶36 We begin by noting that the State fails to meaningfully address whether Defendant was prejudiced by the errors she claims on appeal, relying instead on arguments regarding waiver, lack of preservation, and inadequate briefing. It does assert that the trial court's release of the store manager was "harmless beyond a reasonable doubt" because the store manager "was subpoenaed by the prosecution to testify about [the craft store's] lost and found policy." This ignores the key fact that Defendant planned to rely on the store manager for testimony that Defendant was a good employee who had never had problems on the job. Defense counsel alluded to this evidence during his opening statement, and he was unable to deliver because of the trial court's release of the witness.

¶37    More troublingly, the State's failure to brief the question of prejudice disregards Defendant's contention that while "[t]he appellant usually bears the burden to prove prejudice[,] . . . 'a discovery violation claim may shift the burden to the State to show that the violation was harmless.'" (Quoting *State v. Redcap*, 2014 UT App 10, ¶ 13, 318 P.3d 1202.) When asked about this at oral argument, the State acknowledged that it failed to brief the question of prejudice and indicated, "I do not believe that it would have changed the outcome of this trial given the overwhelming evidence," before returning to the State's position that there was no objection to the acting manager's testimony.

¶38    In *State v. Redcap*, we explained that

> when the error consists of the prosecution's failure to produce inculpatory evidence, the record does not provide much assistance in discovering the nature or magnitude of the resulting prejudice to the defense. The record cannot reveal how knowledge of this evidence would have affected the actions of defense counsel, either in preparing for trial or in presenting the case to the jury.

2014 UT App 10, ¶ 13 (citations and internal quotation marks omitted). Thus, "when the defendant can make a credible argument that the prosecutor's errors have impaired the defense, it is up to the State to persuade the court that there is no reasonable likelihood that absent the error, the outcome of trial would have been more favorable for the defendant." *State v. Knight*, 734 P.2d 913, 921 (Utah 1987). But in *Redcap*, we acknowledged that this burden shift does not occur automatically. *See Redcap*, 2014 UT App 10, ¶ 13 (indicating that "a discovery violation claim *may* shift the burden" to the State to show that the violation was harmless (emphasis added)); *see also State v. Bell*, 770 P.2d 100, 106 (Utah 1988) (recognizing that "in some circumstances the nature of the error involved is such that

[the] de facto burden [placed on the accused to show prejudice] should be shifted and the State required to persuade us that the error was harmless").

¶39    If, as Defendant urges, we determine that this is a case where burden shifting is appropriate, the State clearly has failed to meet such a burden by ignoring the question of prejudice. *Cf. Knight*, 734 P.2d at 921, 922 (reversing a conviction where "the State attempt[ed] to show that the errors were not prejudicial" but the court "[found] the State's arguments unpersuasive"). We conclude, however, that such a determination is unnecessary because the prejudice in this case is clear.

B.    Prejudice Apparent on the Record[10]

¶40    The prejudice resulting from the trial court's rulings is perhaps best seen with reference to defense counsel's opening statement. He previewed for the jurors the evidence he anticipated they would hear based upon information the State supplied to him. This inaccurate preview would eventually undermine his credibility with the jurors. He told them they would hear from three witnesses—the store manager, the customer, and the officer. He explained what he expected the store manager to testify to:

---

10. There is also the possibility that Defendant was prejudiced in ways not apparent on the record. For instance, we have no way of knowing whether any of the jurors were impermissibly related to or otherwise familiar with the acting manager. During the voir dire process, potential jurors were not asked about the acting manager as a potential witness and instead were only asked whether "any of [them were] acquainted with or related to" the officer, the customer, or the store manager. *See supra* ¶ 9.

> She will tell you that she has known [Defendant] for 10 years, worked with her before at -- at a different store, actually hired her at [the craft store] as an assistant manager, and she never had any problems with [Defendant]. She has always been a good employee, and they -- they made a team together at [the craft store], she being the assistant manager, and . . . the store manager, running the [craft] store.

He also told the jury the acting manager "[is] not here today, you won't hear from her." He then previewed the customer's testimony and the story that the jury would see on the surveillance video. In doing so, he specifically stated that "there is no . . . situation where she denied having seen the purse . . . or anything like that." He then briefly previewed the officer's testimony before summarizing the case and sitting down.

¶41 However, as the trial played out, the jury saw and heard very little of what defense counsel indicated would be presented. It never heard from the store manager, including never hearing the positive information she might have provided about Defendant. But it did hear from the acting manager (whom defense counsel had explicitly told the jury would not be a witness). And the jurors heard the acting manager say exactly what defense counsel told them no one would say—that Defendant denied seeing the purse. The deterioration of defense counsel's opening statement can be directly attributed to the trial court's decisions to allow the acting manager to testify and to allow the store manager not to testify.

¶42 "The purpose of an opening statement is to apprise the jury of what counsel intends to prove in his own case in chief by way of providing the jury an overview of, and general familiarity with, the facts the party intends to prove." *State v. Williams*, 656 P.2d 450, 452 (Utah 1982). "The opening statement

is a crucial part of most trials because it is made at a time when the minds of the judge and jurors are probably most open to conditioning by the speaker." 5 Am. Jur. *Trials* § 285 (1966) (footnote omitted). The trial court's rulings prejudiced Defendant by undermining this important tool in presenting her case to the jury.

¶43 Furthermore, the State's discovery violations had a dramatic impact on the substance of the trial. The mid-trial disclosure of the body cam video inhibited defense counsel's ability to effectively cross-examine the officer and to move to exclude inadmissible portions of the video. For example, defense counsel was not as prepared as he otherwise might have been to impeach the officer with contradictory evidence from the video. Additionally, the entire video was provided to the jury, including footage of Defendant invoking her rights; ultimate opinions offered by the officer, such as when he told another officer that Defendant "stole the purse" and told the customer, "We found the person who stole your purse"; and footage of Defendant being taken to jail. *Cf.* Utah R. Evid. 704 (addressing opinions that embrace an ultimate issue in a case); *State v. Baker*, 963 P.2d 801, 806 (Utah Ct. App. 1998) ("The Due Process Clause of the Fourteenth Amendment prohibits use of a defendant's post-*Miranda* silence for impeachment purposes."). Moreover, defense counsel proffered on the record that had he known of the video's existence he would have advised his client differently in going to trial.

¶44 Finally, as we have previously mentioned and as the State acknowledged, convicting Defendant under the facts of this case was largely dependent on the State proving that Defendant had denied seeing the purse. *See supra* ¶¶ 28–29. This fact was provided by a witness who should not have been allowed to testify, given the State's failure to disclose her as a potential witness. Perhaps even more importantly, the testimony was given by a witness with a conviction for retail theft. But because

the witness was undisclosed, defense counsel had no reason to investigate her criminal history and therefore missed the opportunity to impeach her with it.

¶45 All of this, taken together, undermines our confidence that Defendant had a fair trial. *See State v. Perea*, 2013 UT 68, ¶ 97, 322 P.3d 624 (stating that the cumulative error doctrine "is a doctrine used when a single error may not constitute grounds for reversal, but many errors, when taken collectively, nonetheless undermine confidence in the fairness of a trial"). The only way to properly remedy this cumulative prejudice was to grant one of Defendant's many motions for a mistrial; but the trial court denied them all.

CONCLUSION

¶46 The trial court should have granted a mistrial when the body cam video was disclosed in the middle of the trial. The continuance it granted was not sufficient to remedy the prejudice to Defendant. Furthermore, the trial court should not have allowed the acting manager to testify and, especially in light of its decision to allow her testimony, should have required the store manager to remain and testify. These adverse rulings prejudiced Defendant to the point that our confidence in the jury's verdict is undermined. We therefore reverse Defendant's conviction and remand for a new trial.

_____